Ahilan Arulanantham (SBN 237841)
aarulanantham@aclusocal.org
Mohammad Tajsar (SBN 280152)
mtajsar@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 915-0219

R. Alexander Pilmer (SBN 166196)
Alexander.pilmer@kirkland.com
Kirkland & Ellis LLP
333 S. Hope Street, Suite 2900
Los Angeles, CA 90017
Telephone: (213) 680-8405
Facsimile: (213) 680-8500

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR THE
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORA PHILLIPS; ERIKA PINHEIRO; and NATHANIEL DENNISON; | CASE NO: 2:19-CV-06338 |
| *Plaintiffs*, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| UNITED STATES CUSTOMS AND BORDER PROTECTION; MARK MORGAN; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTHEW ALBENCE; FEDERAL BUREAU OF INVESTIGATION; and CHRISTOPHER WRAY, | |
| *Defendants*. | |

# INTRODUCTION

1.     Plaintiffs bring this action to challenge the United States federal government's unconstitutional investigations and surveillance of United States citizens engaged in lawful activities.

2.     Since 2017, the Trump Administration has exacerbated the already difficult asylum process migrants navigate by erecting new legal, political, and physical barriers to lawful immigration to the country. At the same time, migrants' journeys from their countries of origin through the Caribbean, Central America, and Mexico have become more treacherous.

3.     Not satisfied with making migration into the country nearly impossible, Defendants Customs and Border Protection, Immigration and Customs Enforcement, and the Federal Bureau of Investigation—the federal agencies responsible for policing the border, enforcing immigration laws, and investigating criminal activity—trained their gaze on the informal network of humanitarian activists that grew out of the need to support vulnerable migrants and refugees.

4.     Plaintiffs Nora Elizabeth Phillips, Erika Da Cruz Pinheiro, and Nathaniel Garrett Dennison proudly belong to that community, yet found themselves in the government's crosshairs for no other crime than their compassion.

5.     Nora Phillips is a licensed attorney in the State of Illinois. She and the legal organization she co-founded, Al Otro Lado, provide legal and mental health services to immigrants in Los Angeles County. The government surveilled her work, amassed records describing her First Amendment-protected activity, refuses to renew her expedited international travel pass, placed an alert on her passport that prompted Mexican authorities to detain and deport her, and frustrated her ability to secure a Mexican visa.

6.     Erika Pinheiro, a director at Al Otro Lado and a California-licensed immigration attorney, has for years operated legal clinics in Tijuana, Mexico for

hundreds of migrants, deportees, and refugees with little government support, meager financial resources, and in an environment of desperation. Yet the federal government also surveilled her, placed an alert on her passport that resulted in her being deported twice from Mexico, and unlawfully maintains in a secret database records of First Amendment-protected information about her legal work and associations.

7.     Nathaniel Dennison, a documentary filmmaker, founded a non-profit organization dedicated to providing young people tools and camera equipment to document stories mainstream audiences do not often hear. He raised funds to travel to Mexico with the aim of helping young migrants create their own narratives. But the government also secretly investigated him, and now maintains records describing protected information about him, his associations, and his volunteer work. Its investigation resulted in federal border agents detaining Mr. Dennison for six hours at the United States-Mexico border and interrogating him about his work, political opinions, and private associations and activities.

8.     The government's targeting of Plaintiffs is the product of a secret investigative program designed to monitor these humanitarian workers, target them for detention and interrogation, and impede their ability to travel.

9.     In March 2019, reporters at NBC 7 San Diego revealed the details of this covert operation, including pages taken directly from the secret list showing images of the targeted individuals and notations describing how the government flagged them for increased scrutiny and detention. The disclosure of the secret program spurred outrage from civil society organizations, prompted members of Congress to call for an inquiry into the agencies' actions, and led Customs and Border Protection's Inspector General to initiate its own internal investigation into the surveillance.

10.     The government's monitoring of purely humanitarian actors is both immoral and illegal. Plaintiffs have been singled out and targeted solely because of

their protected speech and association, including their provision of legal counsel to asylum seekers, their association with others providing humanitarian aid, and the assistance they provided to clients seeking to redress or to express themselves publicly. In addition, the government's collection and retention of information about Plaintiffs' protected work violates the First Amendment and the Privacy Act, and chills their ability to continue their important work. This lawsuit seeks to undo this damage wrought by the government.

## JURISDICTION

11.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 5 U.S.C. § 552a(g)(1). Because this lawsuit alleges violations of the United States Constitution and a federal statute, it raises questions of federal law.

12.    This Court has authority to grant damages under 5 U.S.C. § 552a, declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief under the Constitution and 5 U.S.C. § 552a.

## VENUE

13.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District, and because Defendants are subject to the court's personal jurisdiction in this District.

## PARTIES

**I.    Plaintiffs**

14.    Plaintiff Nora Elizabeth Phillips is a nationally recognized expert in immigration law. She is the co-founder and Legal Director of Al Otro Lado, a binational legal services organization serving refugees, deportees, and immigrants in Tijuana, Mexico and Los Angeles, California. As its Legal Director, Ms. Phillips manages the operations of Al Otro Lado's Maywood, California office in Los Angeles County, as well as the development and implementation of programs on

1    the LAC+USC Medical Center campus (Los Angeles County Hospital). Ms.

2    Phillips also supervises Al Otro Lado's Homeless Immigrant Services Program,

3    which assists people experiencing homelessness throughout various sites in Los

4    Angeles County.

5         15.    Prior to her work at Al Otro Lado, Ms. Phillips served as an Equal

6    Justice Works Fellow at the Legal Assistance Foundation of Metropolitan Chicago,

7    a Staff Attorney for the Central American Resource Center ("CARECEN"), and a

8    founding partner of a Los Angeles-based immigration law firm, Phillips & Urias,

9    LLP. She has extensive experience in U visas, Violence Against Women Act self-

10   petitions, and benefits under the Deferred Action for Childhood Arrivals program.

11   She has represented clients in removal proceedings (detained and non-detained),

12   and has extensive experience with family-based immigration, naturalization,

13   Advance Parole, adjustment of status, I-751 battered spouse waivers, Humanitarian

14   Parole, asylum, withholding of removal, Convention Against Torture, and Global

15   Entry revocations.

16        16.    Government agencies on both sides of the border have relied upon

17   Ms. Phillips' immigration expertise. At the invitation of the Nonimmigrant Visa

18   Section of the United States Consulate in Tijuana, Ms. Phillips trained the consular

19   staffs of the United States, Guatemala, Honduras, and El Salvador on U and T visa

20   petitions. While at CARECEN and again in private practice, Ms. Phillips

21   contracted with Mexican consulates to provide legal services to certain Mexican

22   nationals, and performed numerous trainings and educational workshops for

23   Mexican consular staff and Mexican nationals in need of legal assistance. Ms.

24   Phillips also served as an immigration law instructor for the *Comisión Nacional de*

25   *los Derechos Humanos*, translated as the National Human Rights Commission,

26   based in Mexico City.

27        17.    Ms. Phillips is a graduate of the DePaul University College of Law in

28   Chicago, Illinois. She is a United States citizen and currently resides in Los

Angeles, California.

18.     Plaintiff Erika Da Cruz Pinheiro is also a recognized expert in immigration law. She is one of the three Directors of Al Otro Lado, and is the organization's Director of Litigation and Policy. In this capacity, she provides cross-border legal services to refugees and families separated by deportation, and supervises a team of legal staff and volunteers. Under Ms. Pinheiro's direction, Al Otro Lado's Family Reunification Project represents parents separated from their children by U.S. authorities, with a focus on reunifying parents deported without their children. Ms. Pinheiro also manages Al Otro Lado's San Diego office where she supervises the provision of direct legal services to clients, with a primary focus on representing detained immigrants. In addition to Al Otro Lado's direct services work, Ms. Pinheiro oversees the organization's impact litigation, which involves fact finding and coordination with litigation teams for five class action lawsuits in which Al Otro Lado is either a plaintiff or counsel.

19.     In her legal capacity, Ms. Pinheiro has represented adults, families, and unaccompanied minors in immigration proceedings, clients in complex gang-based asylum claims, and youth applying for special immigrant juvenile status.

20.     Prior to her work for Al Otro Lado, Ms. Pinheiro administered federally-funded, high-volume immigration legal access programs in county jails and immigration detention facilities housing adults and children. Ms. Pinheiro helped create an all-volunteer Legal Orientation Program for immigration detainees housed in Orange County jails. Ms. Pinheiro also managed legal orientation programs for unaccompanied children and their sponsors.

21.     Throughout her career, Ms. Pinheiro has conducted numerous continuing legal education trainings on a broad range of immigration law topics to audiences in law enforcement, government agencies, and civil society organizations. Ms. Pinheiro also offered regular technical assistance to the County of Los Angeles in crafting pro-immigrant policies for public agencies serving

1  noncitizens.

2       22.    She is a graduate of Georgetown University, where she earned both a

3  J.D. and a master's degree in public policy. Ms. Pinheiro is a United States citizen

4  currently residing in Baja California, Mexico. Prior to Defendants' investigation

5  and surveillance of Ms. Pinheiro, she regularly visited and worked out of Los

6  Angeles, where Al Otro Lado's headquarters is located.

7       23.    Plaintiff Nathaniel Garrett Dennison is the founder and executive

8  director of Richmond, Virginia-based non-profit Through My Eyes Foundation. A

9  filmmaker, photographer, and journalist by training, Mr. Dennison's non-profit

10 provides camera equipment and training to young people interested in making

11 narrative texts, including documentaries, to share their experiences in their own

12 voices. Mr. Dennison traveled to Mexico in December 2018 on behalf of Through

13 My Eyes on a project designed to allow migrant youth to document their migration

14 journeys. In the process, the federal government subjected to investigation,

15 surveillance, detention, and interrogation without lawful justification. Mr.

16 Dennison is a United States citizen and currently resides in Richmond, Virginia.

17 **II.**    **Defendants**

18      24.    Defendant United States Customs and Border Protection ("CBP") is

19 the agency within the Department of Homeland Security ("DHS") responsible for

20 policing the borders, coastlines, and ports of entry of the United States. Among

21 other mandates, it is authorized to investigate, inspect, and detain individuals

22 crossing the border at and between ports of entry. CBP is an agency of the United

23 States government within the meaning of the Privacy Act.

24      25.    Defendant Mark Morgan is the Acting Commissioner of CBP. As

25 head of the agency, Mr. Morgan oversees all CBP operations, including its

26 investigative and surveillance operations along the United States-Mexico border.

27 He is named in his official capacity.

28      26.    Defendant Immigration and Customs Enforcement ("ICE") is the

agency within DHS responsible for managing all aspects of the immigration enforcement process. ICE apprehends, incarcerates, and removes noncitizens from the United States. Homeland Security Investigations ("HSI") is a component of ICE and is the largest investigative arm of the Department of Homeland Security. HSI employs over 6,000 special agents in 30 field offices. HSI special agents are tasked with gathering intelligence and investigating violations of various immigration and border-related criminal laws. HSI also houses the Office of Intelligence and International Operations, both subcomponents dedicated to international intelligence gathering and responsible for collecting intelligence for use within HSI and by other DHS agencies. ICE and HSI are agencies of the United States government within the meaning of the Privacy Act.

27.     Defendant Matthew Albence is the Acting Director of ICE. Among other duties, Mr. Albence oversees the operation of ICE and its components, including HSI. He is named in his official capacity.

28.     Defendant Federal Bureau of Investigation ("FBI") is the principal federal law enforcement agency housed within the Department of Justice. Among other responsibilities, it is tasked with investigating violations of federal criminal law and collecting and maintaining intelligence records on individuals its agents investigate. It collaborated with CBP and ICE's HSI in their investigation and surveillance of Plaintiffs. The FBI is an agency of the United States government within the meaning of the Privacy Act.

29.     Defendant Christopher A. Wray is the Director of the FBI. In his role, Mr. Wray directs and oversees the operations of the FBI, including work the agency performs in its field offices nationwide. He is named in his official capacity.

**STATEMENT OF FACTS**

I.    **Under the Trump Administration, the federal government dramatically cut the admission of and public support for migrants and refugees.**

30.    Federal law enforcement agencies under the Trump Administration have demonstrated increasing hostility towards migrants, refugees, and asylum seekers wishing to enter the United States. The Administration has erected numerous legal barriers to seeking asylum in the United States, exacerbating the already difficult path to finding refuge in the country. Upon entering his position, then-Attorney General Jeff Sessions "limited the ability of asylum seekers to appeal decisions, restricted the discretion that immigration judges have over their own dockets, and used his authority as Attorney General to personally review immigration cases," including reversing precedent on migrants seeking refuge from domestic violence in their home countries.[1] Under his leadership, the federal government aggressively turned away individuals seeking refuge from persecution in their home countries, including returning them to Mexico even after they present at ports of entry claiming asylum.

31.    For instance, beginning in April 2018, the Trump Administration regularized the use of so-called "metering" at ports of entry. Metering refers to CBP's practice of limiting the numbers of people who can request asylum at a port of entry. CBP requires asylum seekers to place their names on a waitlist and to return to Mexico to wait, often for months, prior to returning to present their claims. This dramatically increased the numbers of individuals needing support from Mexican shelters while they awaited processing. At the same time, border agents intensified the practice of illegally turning back asylum seekers who

---

[1] Jonathan Blitzer, The Trump Administration Is Completely Unravelling the U.S. Asylum System, THE NEW YORKER (June 11, 2018), https://www.newyorker.com/news/news-desk/the-trump-administration-is-completely-unraveling-the-us-asylum-system.

(cont'd)

1   lawfully present for the purposes of seeking asylum—a violation of both domestic

2   law and international treaty obligations.[2]

3       32.    In addition to increasing legal barriers to migration, the federal

4   government also placed diplomatic pressure on neighboring countries to quell

5   migration to the United States. The Trump Administration threatened to cut aid to

6   Honduras, Guatemala, and El Salvador if the countries did not halt migrants' travel

7   into Mexico.[3] In recent months, the Administration used the threat of tariffs to

8   demand Mexico step up its law enforcement and military response to migration

9   through its borders. This in part resulted in the deployment of Mexican National

10  Guard troops to track down migrants and in the expansion of the Migration

11  Protection Protocols (widely known as the "Remain-in-Mexico" program) that

12  force asylum seekers to wait in Mexico while their asylum requests are pending.[4]

13      33.    While the United States government erected legal and procedural

14  barriers for migration from Mexico, Central America, the Caribbean, and other

15  parts of the world, immigration to the United States continues apace. Family

16  reunification, economic insecurity, political instability, rising crime levels, and

17  climate change have driven the movement of people to the United States.[5] This

18

19      [2] B. SHAW DRAKE, ELEANOR ACER, AND OLGA BYRNE, Crossing the Line:
20  U.S. Border Agents Illegally Reject Asylum Seekers, HUMAN RIGHTS FIRST (2017),
    http://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf.

21      [3] Kirk Semple, *Trump Threatens to Punish Honduras Over Immigrant*
22  *Caravan*, THE NEW YORK TIMES (Oct. 16, 2018), https://nyti.ms/2YaigZx

23      [4] Michael D. Shear and Maggie Haberman, *Mexico Agreed to Take Border*
    *Actions Months Before Trump Announced Tariff Deal*, THE NEW YORK TIMES
24  (June 8, 2019), https://nyti.ms/2XW7pXS; Bobby Allyn, *Asylum Officers: Trump's*
    *'Remain In Mexico' Policy Is Against 'Moral Fabric' Of U.S.,* NPR (June 27, 2019),
25  https://n.pr/2JZIFnI.

26      [5] JILL H. WILSON, CONG. RESEARCH SERV., R45489, Recent Migration to the
    United States from Central America: Frequently Asked Questions (2019),
27  https://fas.org/sgp/crs/row/R45489.pdf at 5–6 (describing factors contributing to
28  Central American migration).

(cont'd)

comes as migration worldwide increased dramatically from 2000 to 2017, up from 173 million international migrants to 258 million in that period.[6] As a result, this migration has created a dangerous bottleneck for migrants forced to wait in Mexico to access the asylum process.

34.    Neither the Mexican nor American governments have adequately responded to the needs of migrants trapped between the conditions of their home countries and the barriers created at the United States border. Migrants have found increasingly limited access to food, shelter, medicine, education, and legal support in Mexico—services that the Mexican government refuses to support and the American government refuses to fund.[7] As a result, a need developed among migrants for collective organizing and for increased humanitarian aid.

35.    Beginning in the middle of 2018, national attention turned to the numbers of migrants traveling through Central America and Mexico aiming to resettle either in Mexico or the United States. These migrants trekked in what became known as caravans, collectives that travel together to ensure their own safety, to procure services the Mexican government and civil society did not provide them, and to avoid the costs of smugglers.[8] Although migration in caravans

---

[6] UNITED NATIONS, DEPARTMENT OF ECONOMIC AND SOCIAL AFFAIRS, POPULATION DIVISION, *International Migration Report 2017: Highlights* (2017), https://www.un.org/en/development/desa/population/migration/publications/migrationreport/docs/MigrationReport2017_Highlights.pdf.
[7] Brandon Lewis, *Tijuana Migrant Shelters Search for Funding after Mexican Government Pulls Support*, CBS8 (June 27, 2019), http://bit.ly/2LHOuKb (describing withdrawal of Mexican government support for migrant shelters in Tijuana); David Agren, *Catholic Shelters in Mexico Rely on People's Good Will,* THE TABLET (June 19, 2019), https://thetablet.org/catholic-shelters-mexico-goodwill/ (same); James Frederick, *How Mexico Beefs Up Immigration Enforcement on Trump's Terms*, NPR (July 13, 2019), https://n.pr/2XZcjmV ("Government and nonprofit shelters are overwhelmed and migrants say they receive little or no support from the Mexican government.").
[8] WILSON, *supra* note 5, at 7 (explaining origins of migration via caravans).

(cont'd)

has occurred since the late 1990s, the October 2018 caravan was reportedly the largest ever.[9] Though initially numbering in the hundreds, it grew to include 7,000 people by one local government estimate.[10]

   36.   The Trump Administration aggressively demonized the caravans. President Trump himself called the caravan a "Democrat Party led . . . assault on our country,"[11] while Vice President Mike Pence called it a "blatant disregard for our border & sovereignty."[12] Official statements from then-DHS Secretary Kirstjen Nielsen discouraged members of "the so-called 'caravan'" from coming to the country,[13] suggested that they harbor "the apparent intention of entering the United States illegally," and proclaimed that "[a] sovereign nation that cannot—or worse, chooses not—to defend its borders will soon cease to be a sovereign nation."[14] And in remarks to CBP officers, President Trump even declared that seeking asylum is itself illegal, instructing agents to state that the "system is full" and telling migrants to "turn around."[15]

---

[9] Ted Hesson, *Trump Has Whipped Up a Frenzy on the Migrant Caravan: Here Are the Facts*, POLITICO (Oct. 23, 2018), https://politi.co/2LyjRqt.

[10] Maya Averbuch and Kirk Semple, Migrant Caravan Continues North, Defying Mexico and U.S., THE NEW YORK TIMES (Oct. 20, 2018), https://www.nytimes.com/2018/10/20/world/americas/migrants-caravan-mexico.html.

[11] Donald Trump (@realDonaldTrump), TWITTER (Oct. 18, 2018, 4:25 AM), https://twitter.com/realDonaldTrump/status/1052883467430694912.

[12] Vice President Mike Pence (@vp), TWITTER (Oct. 16, 2018, 8:39 AM), https://twitter.com/vp/status/1052222426795466752.

[13] Secretary Nielsen Statement on Arrival of Central American 'Caravan' (April 25, 2018), https://www.dhs.gov/news/2018/04/25/secretary-nielsen-statement-arrival-central-american-caravan.

[14] Secretary Kirstjen M. Nielsen Statement on Central American 'Caravan' (April 23, 2018), https://www.dhs.gov/news/2018/04/23/secretary-kirstjen-m-nielsen-statement-central-american-caravan.

[15] Jason Zengerle, *How America Got to 'Zero Tolerance' on Immigration: The Inside Story*, THE NEW YORK TIMES (July 16, 2019), https://nyti.ms/2ObjAM8 (quoting President Trump's statement that "The system is full. Can't take you

(cont'd)

## II.     Human rights organizations stepped in to provide humanitarian aid and legal counsel to families migrating to the United States for refuge.

37.     In response to continuing migration and the lack of basic services in Mexico to support the migrants, an informal network of legal practitioners, civil society organizations, and individual humanitarian activists developed to support them on their journey.[16] This includes Al Otro Lado and Through My Eyes Foundation, the organizations which Plaintiffs founded. While many of these individuals and organizations had long supported migrants (like Plaintiffs Nora Phillips and Erika Pinheiro), the increased focus on these caravans in 2018 expanded this support network to include organizations and individuals that were new to the work (like Plaintiff Nathaniel Dennison).

38.     While severely limiting asylum seekers' ability to present their claims themselves, the federal government also targeted this network of human rights activists. It did this under the guide of a CBP program dubbed "Operation Secure Line." At an October 29, 2018 press conference, then-CBP Commissioner Kevin McAleenan described the operation as a "a multi-phased and flexible operational response designed to ensure that we are prepared for any number of contingencies involved with the arrival and attempted crossing of a large group of intending migrants at our border, whether they attempt to cross at a port of entry or unlawfully in between ports of entry."[17] Among other purposes, Operation Secure

---

anymore. Whether it's asylum, whether it's anything you want, it's illegal immigration. We can't take you anymore. We can't take you. Our country is full.").

[16] AMNESTY INTERNATIONAL, 'Saving lives is not a crime': Politically motivated legal harassment against migrant human rights defenders by the USA (2019) at 6, http://bit.ly/SavingLivesAmnesty; WILSON, *supra* note 5, at 7.

[17] U.S. DEP'T OF DEFENSE, Homeland Security and Defense Department Officials Joint Press Conference on the Defense Department Deployment to the Southwest Border (Oct. 29, 2018), http://bit.ly/2LDOOt1/.

(cont'd)

1   Line was the government program "designated to monitor the migrant caravan."[18]

2   Under the operation, Defendants began targeting Plaintiffs and their fellow

3   humanitarian activists.

4       39.     Starting in May 2018, and escalating in December 2018 and January

5   2019, officers of Defendants CBP, FBI, and ICE began investigating, harassing,

6   detaining, and questioning these activists and legal workers at the border, as well

7   as journalists covering the migrants' journeys.[19] One report relying on nineteen

8   sources "described law enforcement actions ranging from the barring and removal

9   of journalists and lawyers from Mexico, to immigrant rights advocates being

10  shackled to benches in U.S. detention cells for hours at a time."[20] Others

11  "described [journalists and activists] being forced to turn over their notes, cameras,

12  and phones while plainclothes U.S. border officials pumped them for information

13  about activists working with members of the caravans."[21]

14      40.     This pattern of harassment and detention coincided with a December

15  1, 2018 email sent by David Shaw, the Special Agent in Charge of the San Diego

16  office of Homeland Security Investigations, to all his subordinate agents.[22] The

17  email stated that Homeland Security Investigations is "increasing our intelligence

18  _____

19      [18] Tom Jones, et al., *Source: Leaked Documents Show the U.S. Government Tracking Journalists and Immigration Advocates Through a Secret Database*,

20  NBC 7 SAN DIEGO (Mar. 6, 2019), http://bit.ly/NBC7story.

21      [19] Ryan Devereaux, *Journalists, Lawyers, and Activists Working on the Border Face Coordinated Harassment From U.S. and Mexican Authorities*, THE

22  INTERCEPT (Feb. 8, 2019), https://theintercept.com/2019/02/08/us-mexico-border-journalists-harassment/.

23      [20] *Id.*

24      [21] *Id.*; Kate Morrissey, *Volunteers, Activists, Journalists Interrogated at Border About Caravan,* THE SAN DIEGO UNION TRIBUNE (Feb. 11, 2019),

25  http://bit.ly/2XWuPfP (describing volunteers, activists, and journalists detained

26  and interrogated at the border).

27      [22] Mari Payton et al., *Leaked Email Reveals How Federal Agents Used Confidential Sources and Informants to Gather Information about Migrant*

28  *Caravan*, NBC 7 SAN DIEGO (Mar. 8, 2019), http://bit.ly/2SygYGG.

(cont'd)

collection efforts" in response to the migrant caravan. Shaw instructed agents to "question available sources of information to include Confidential Informants (C/Is) and Sources of Information (SOIs) regarding the migrants, the caravan and it's [sic] leaders, and any criminal or cartel related actions concerning migrants or the caravan."[23] All information received is to be "documented as per standard operating procedures" and forwarded to the agency's Chief Intelligence Officer.[24] The email further states that the information "is being collected locally through the Incident Command Center, our SIG agents and IRS, and being routed through Headquarters [in Washington D.C.]."[25]

41.     One month later, Defendants created a secret database of 59 individuals—including Plaintiffs—who wrote about, provided legal advice to, associated with, or otherwise supported migrants attempting to seek asylum in the United States.[26] Many of them, like Plaintiffs, are United States citizens. The report that revealed this database published a version of it dated January 9, 2019 along with a description of how Defendants organized the list, how the list presented information about the targeted individuals, what information and records the government collected on these individuals, and select images of the list itself.

42.     Defendants entitled the list "San Diego Sector Foreign Operations Branch: Migrant Caravan FY-2019, Suspected Organizers, Coordinators, Instigators and Media." One of the purposes of the list was to memorialize "who officials think should be targeted for screening at the border" and for further retaliatory scrutiny, including revocations of travel privileges and international alerts limiting the targets' ability to travel expeditiously.[27]

43.     Investigations into the individuals on the dossier, including Plaintiffs,

---

[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *See* Jones, *supra* note 18.
[27] *Id.*

involved coordination between Defendant CBP, responsible for the detentions and seizures of individuals at the border, Defendant ICE's HSI, responsible for the interrogations of these activists, and Defendant FBI's local San Diego field office, which provided support to the operation. Officials from each agency accessed the list through a SharePoint application. All three agencies jointly manage the list and investigated, surveilled, and collected First Amendment-protected information about individuals on the list.

44.    The secret surveillance operation also suggests a collaboration between Defendants and officials from the Mexican government who supported Defendants' actions. The title page of the list contains an emblem with both a Mexican and American flag, underneath which is a notation that reads "ILU-OASSIS-OMEGA." That notation refers to the International Liaison Unit (ILU), a government component that coordinates intelligence sharing between Mexico and the United States. "OASISS" refers to the Operation Against Smugglers Initiative on Safety and Security.

45.    The OASISS program, created in 2005, was designed to share intelligence between the countries to prosecute "Mexican human smugglers, through Mexican courts, using information obtained via interviews conducted by Border Patrol agents while in U.S. custody."[28]

46.    Despite the original intention of the program, Defendants commandeered OASISS to enable the surveillance of human rights defenders like Plaintiffs. Defendants deputized Mexican officials through OASISS "to surveil

---

[28] United States Border Patrol, Mexican Government Partner to Combat Human Smuggling (June 23, 2017), https://www.cbp.gov/newsroom/local-media-release/border-patrol-mexican-government-partner-combat-human-smuggling; *see also* Enhancing DHS' Efforts to Disrupt Alien Smuggling Across our Borders: Hearing before the Subcomm. on Border, Maritime, and Global Counterterrorism, of the H. Comm. on Homeland Security, 111th Cong. (2010), *available at* http://bit.ly/2JLAr40.

(cont'd)

defenders and restricts their freedom of movement, apparently based on travel warnings issued by the US government, under its politically motivated criminal investigation of migrant human rights defenders on smuggling chargers."[29]

47.    Defendants' wide-ranging surveillance operation collected an extraordinary amount of information about its targets. For every individual, the database includes a photograph of the person, their name, their date of birth, their "country of commencement," and their "role" within the larger cross-border migrant support network. The list also includes information about whether Defendants placed an alert on the person (under a space called "Alert Placed"), whether Defendants detained, arrested, or interviewed a person (demarked by a colored "X" mark over their photo), or whether the United States government revoked their visa or Trusted Traveler pass (under a space called "Disposition"). The leaked list demonstrates that Defendants placed alerts on individuals, subjected them to invasive searches and questioning at the border, and revoked their visas and Trusted Traveler passes.

48.    Plaintiffs Erika Pinheiro, Nora Phillips, and Nathaniel Dennison all appear on the secret surveillance list, as follows:







---

[29] AMNESTY INTERNATIONAL, *supra* note 16, at 18.

49.     In addition to the list itself, Defendants also created separate, individual dossiers on each person in the database containing private and First Amendment-protected information. In the case of one dossier about another Al Otro Lado director, Defendants amassed a trove of records about her, "including specific details about the car she drives, her mother's name, and her work and travel history," as well as information that describes her associational activity with migrants and other humanitarian organizations.[30] Based on the initial reporting of the list, and upon information and belief, Defendants maintain dossiers of each Plaintiff containing similar private information and similar First Amendment-protected information.

50.     Defendants' suspicionless surveillance program extends beyond the California border. While the leaked list arose out of the "San Diego Foreign Operations Branch," Defendants targeted many human rights defenders and legal workers in Arizona and in Texas for unlawful scrutiny, surveillance, and detention.[31] This is consistent with David Shaw's email stating that information received as a result of Defendants' surveillance operations was "being routed through Headquarters," suggesting a widespread practice that extends beyond the San Diego sector to ports of entry across the border states.

**III.   After the secret program's disclosure, Defendants routeinly shifted their justifications for their unlawful surveillance operation.**

51.     Defendants conducted this dragnet investigation and surveillance program without legal justification or any credible suspicion that their targets were engaged in or likely to engage in criminal activity. Reporting on the creation of the list, as well as Defendants' public statements made in response, reveal that

---

[30] Jones, *supra* note 18.

[31] AMNESTY INTERNATIONAL, *supra* note 16, at 15; Julia Ainsley, *More Lawyers, Reporter Stopped and Questioned at Border by U.S. Officials,* NBC NEWS (March 17, 2019), https://nbcnews.to/2M7uIXU.

suspicion of past or future criminal activity did *not* motivate Defendants' investigatory interest. Instead, Defendants based their operation on the activists and legal workers' First Amendment-protected activity and associations, including their associations with migrants, their organizational links with other activists, their provision of legal counsel and humanitarian assistance, other forms of support they provided to migrants, and their public statements.

52.    Since publication of details of Defendants' secret database, Defendants have shifted their public justification for their covert investigation and surveillance program. In advance of news about the list breaking, CBP issued a statement declaring

> Criminal events, such as the breach of the border wall in San Diego, involving assaults on law enforcement and a risk to public safety, are routinely monitored and investigated by authorities. These activities could result in a more thorough review of those seeking entrance into our country. It is protocol following these incidents to collect evidence that might be needed for future legal actions and to determine if the event was orchestrated. CBP and our law enforcement partners evaluate these incidents, follow all leads garnered from information collected, conduct interviews and investigations, in preparation for, and often to prevent future incidents that could cause further harm to the public, our agents, and our economy.[32]

53.    The statement does not suggest that the individuals subjected to Defendants' investigation and surveillance were present during any breach of the border wall, had information relevant to ongoing investigations into any breach, or were suspected to have committed a crime during any such breach. Defendants maintain no such suspicion against Plaintiffs. Plaintiffs have never organized or

---

[32] U.S. CUSTOMS AND BORDER PROTECTION, Statement provided to NBC 7 San Diego, https://assets.documentcloud.org/documents/5759650/CBP-Full-Statement.pdf (linked to in Jones article, *supra* note 18).

assisted in the organization of the migrant caravans or in any attempts at unlawful crossing of the border. The statement also references "varying terrains" and "the threats of smugglers and traffickers," but again does not claim that Defendants had any suspicion that the individuals targeted by the program were smugglers or traffickers.

54.     Five days after publication of the secret watchlist, CBP shifted its message away from hypothetical smuggling or trafficking. In a new statement, the agency stated "that the names in the database are all people who were present during violence that broke out at the border in November. The agency also said journalists are being tracked so that the agency can learn more about what started that violence."[33] This new justification refers to unrest in Tijuana, Mexico on November 25, 2018 during which a peaceful march launched by migrants in Tijuana resulted in CBP shutting down border crossings in the city and firing tear gas at families seeking to enter the United States.[34]

55.     Despite Defendants' suggestion otherwise, many of the 59 individuals on the list, including Plaintiffs, were not present during the march that afternoon. They nevertheless appear on the list. For instance, Ms. Phillips was working in Tijuana that day on family separation cases approximately ten miles away from the site of the unrest, while Mr. Dennison and Ms. Pinheiro were in Virginia and New Jersey, respectively.

56.     Defendants also suggested that they targeted individuals who were involved in an incident on December 31, 2018 at the border in Tijuana where CBP

---

[33] Jones, *supra* note 18 (video entitled "Federal Agencies Keep Secret Database," at 3:45).
[34] Maya Averbuch & Elisabeth Malkin, *Migrants in Tijuana Run to U.S. Border, but Fall Back in Face of Tear Gas*, N.Y. TIMES (Nov. 25, 2018), https://nyti.ms/2Y9tQV1.

(cont'd)

agents again attacked migrants attempting to cross the border with tear gas.[35] Neither Ms. Phillips nor Ms. Pinheiro were present there either, while Mr. Dennison arrived after the initial tear gassing and only to document the incident from the Mexican side of the border.

57.     On May 9, 2019, CBP issued yet another statement, this time in response to a letter signed by a coalition of more than 100 organizations led by the Center for Democracy & Technology expressing its opposition to Defendants' surveillance program. The CBP statement justified the investigation of activists and journalists because "the threat level of the Central American migrant caravan in Mexico reached higher than normal levels" in October 2018, and described the migrants as having "[d]emonstrated violent tendencies, and present[ing] transportation, medical, and housing demands to the Government of Mexico."[36] It stated that CBP "utilized various sources of information in assessing the intentions of the caravan," which "helped identify a number of people involved in assisting migrants in crossing the border illegally or having witnessed the violent actions taken against law enforcement at the border." In the process of conducting its investigation, however, CBP conceded that it "may inconvenience law-abiding persons in our efforts to detect, deter, and mitigate threats to our homeland."

## IV.   Defendants' collection of Plaintiffs' First Amendment-protected information

### A.     *Al Otro Lado provides humanitarian assistance and legal services to refugees, migrants, and deportees in the United States and Mexico.*

58.     Al Otro Lado is a non-profit, non-partisan organization incorporated

---

[35] *U.S. Fires Tear Gas Across Mexico Border to Stop Migrants*, PBS.ORG NEWSHOUR (Jan. 1, 2019), https://to.pbs.org/30J8sHM.

[36] Letter from Randy J. Howe, Exec. Dir., Office of Field Operations, U.S. Customs and Border Protection, to Mana Azarmi, Policy Counsel, Ctr. for Democracy & Tech. (May 9, 2019), https://bit.ly/2YkJKzV.

in California in 2014. It provides legal services to indigent deportees, migrants, refugees and their families, principally in Los Angeles and Tijuana. Al Otro Lado's mission is to coordinate and to provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings, to seek redress for civil rights violations, and to aid with other legal and social service needs.

59.     Among others, Al Otro Lado runs the "Border Rights Project," a program that works with asylum seekers in Tijuana by providing direct legal representation, convening community education fora centered around asylum and refugee law, and vindicating individuals' rights to claim internationally protected asylum status.

60.     Al Otro Lado also litigates on behalf of itself and other immigrants and migrants against the United States on issues related to migration, immigration, and refugee rights. For instance, in 2017, lawyers at the Center for Constitutional Rights, the Southern Poverty Law Center, and Latham & Watkins LLP representing Al Otro Lado filed a class action lawsuit against officials at DHS challenging CBP's practice of depriving asylum seekers access to the U.S. asylum process. The plaintiffs in that litigation, including Al Otro Lado, allege that CBP and DHS systematically violate U.S. and international law by denying individuals even the opportunity to apply for asylum by consistently turning away individuals facing persecution. The lawsuit documents numerous cases in which CBP denied asylum seekers the right to seek protection when presenting themselves at ports of entry.

**B.      *Defendants' suspicionless investigation targeted Plaintiff Nora Phillips and resulted in her surveillance, detention, and deportation from Mexico.***

61.     Nora Phillips lives and works in Los Angeles, where she supervises hundreds of cases and a staff of ten in Al Otro Lado's office in Maywood,

California, in Los Angeles County. Her work with Al Otro Lado requires that she travel to Tijuana, Mexico approximately six to nine times per year for work, each time for two to four days. She previously made such trips on a multiple-entry business visa that allowed her to travel throughout Mexico.

62.     As a necessary expedient to her work, Ms. Phillips applied for and received a Secure Electronic Network for Travelers Rapid Inspection ("SENTRI") pass from CBP. The SENTRI pass is one of CBP's Trusted Traveler programs, which provide qualified and pre-approved individuals expedited security screening processes for traveling internationally. SENTRI allows accelerated entry into the United States from Canada and Mexico by air and land. SENTRI membership is valid for five years unless revoked due to a criminal conviction, a customs or immigration charge, or a declaration of inadmissibility to the United States under immigration laws. As of the date of this filing, an application for a SENTRI pass for one adult costs $122.25. Ms. Phillips' SENTRI pass expires in October 2019.

63.     Because of her work, Ms. Phillips is widely and publicly associated with Al Otro Lado. Her name appears in Defendants' secret watchlist, with a role listed as "Unknown" and a disposition of "Pending." Upon information and belief, Defendants maintain a dossier containing both private and First Amendment-protected information about Ms. Phillips as part of its surveillance and data-collection program, all without any suspicion of past or future criminal activity.

64.     Ms. Phillips suffers from a rare degenerative disorder, Ehlers-Danlos Syndrome, that causes chronic joint and connective tissue pain and organ rupture, among other issues. The incurable disorder requires medication, and stress exacerbates its symptoms.

65.     Due to these various health issues limiting her travel to Mexico, Ms. Phillips declined to renew her business visa allowing her to travel and work in Mexico. Al Otro Lado is currently in the process of completing its *asociación civil* (non-profit) registration in Mexico, which would allow its staff to operate on

1    nonimmigrant NAFTA Professional (TN) visas.

2        66.    On January 31, 2019 (22 days after the date listed on the secret list),

3    Ms. Phillips flew with her husband, seven-year-old daughter, and close friend from

4    Los Angeles International Airport to the Miguel Hidalgo y Costilla Guadalajara

5    International Airport in Guadalajara, Mexico. The purpose of the trip was solely

6    tourism: Ms. Phillips planned to accompany her friend's visit to Mexico to see his

7    family for the first time in ten years.

8        67.    Ms. Phillips, her family, and her friend arrived in Guadalajara at 12:15

9    a.m. When she did, a Mexican Instituto Nacional de Migración ("INM") officer

10   who checked the party's passports informed Ms. Phillips that an *alerta*—Spanish

11   for "alert"—had been placed on her passport.

12       68.    Agents subsequently escorted Ms. Phillips to an office, where an INM

13   supervisor informed her that the *alerta* had likely been placed either because

14   someone else with her name had a pending criminal case or because she had lost

15   her passport in 1998. The supervisor informed Ms. Phillips that this situation

16   occurred occasionally, and that the party had merely to wait for 15 minutes for the

17   American embassy in Mexico City to respond.

18       69.    The officials present in the holding room did not appear to know why

19   the *alerta* was placed, but explained that a government places an *alerta* on an

20   individual if there are criminal proceedings against that person and the government

21   does not want that individual to leave. Based on her experience in detention and

22   the statements of Mexican officials to her, Ms. Phillips understood that the United

23   States government had placed the *alerta* and wanted to prevent her from

24   performing her work.

25       70.    At this point, the officers appeared to have a questionnaire printed out

26   with various questions that they asked Ms. Phillips. The questions included where

27   she lived, what languages she spoke, how much money she currently possessed,

28   where she was staying, why she was there, when she would leave, and additional

extensive questions as to whether she faced pending criminal proceedings in Mexico or elsewhere. Ms. Phillips answered these questions, but was not provided access to the questionnaire itself, the questions included on the document, or the notes the officers asked upon hearing her answers. When the questioning finished, the officers informed Ms. Phillips they would send answers back to Mexico City and that she did not need to wait much longer.

71.     Ms. Phillips informed two of the Mexican agents that she is a human rights attorney working with refugees and separated families, and that her organization, Al Otro Lado, has sued the federal government multiple times. She also informed the agents that her colleagues had their Global Entry/SENTRI program benefits revoked without explanation. After learning about the timing of Al Otro Lado's lawsuits, the SENTRI revocations, and the *alertas*, the agents said something to the effect of, "Oh, *that's* why this happened – when did you file your lawsuit?" and asked whether the suit was brought on her behalf or on behalf of her organization.

72.     At 1:47 a.m., Mexican officials informed Ms. Phillips that she would be detained and returned to the United States.

73.     Ms. Phillips asked if her daughter and husband could come into her room to take her daughter's belongings, which had been with Ms. Phillips during her detention.

74.     Her daughter and husband were escorted into the room, at which point her daughter, who had previously been asking for her mother, began crying and refused to leave her mother. Ms. Phillips then informed the Mexican agents that her daughter needed to stay with her.

75.     At this point, Ms. Phillips was very scared, upset, and crying. The room the officials detained Ms. Phillips in was cold, about six feet by six feet large, and contained a stained small couch and loveseat, coffee table, and a row of plastic chairs.

76. At around 2 a.m., Mexican officials informed Ms. Phillips that they would place her on a return flight at 6 a.m. on Viva Aerobus. They informed her that a representative from Viva would arrive to process her boarding passes and provide her and her daughter food and water.

77. During this period, Ms. Phillips managed to put her daughter to sleep using a thin scarf as a blanket, despite her daughter being sick with a cold and exhausted from the trip and ordeal. When her daughter did wake periodically, she was disoriented, confused, and hungry.

78. Ms. Phillips did not sleep during her detention. The room was too cold, and she was in too much pain. She attempted to calm herself down, but at multiple points was hypersalivating, dry-heaving, and near vomitting.

79. At 5:52 a.m., Mexican officials informed Ms. Phillips that she would not be on the 6 a.m. flight after all, and instead would be placed on a 10:10 a.m. flight.

80. By this point, Ms. Phillips had been in detention for approximately five hours suffering from a prolonged panic attack, in extreme pain, suppressing frequent urges to vomit, sweating, dizzy, suffering from constant twitching of her left eye, interstitial cystitis (urgency to urinate), numbness of several fingers, pain in her left breast from a circulatory disorder called Reynaud's Syndrome, and extreme dizziness due to vascular fragility (a problem associated with sudden blood pressure drops that occur in stressful conditions when she stands or changes positions).

81. She also had not eaten or drank anything during this period, despite repeated requests to Mexican officials. She was allowed a bathroom visit twice.

82. At around 8 a.m., Ms. Phillips begged a female member of the cleaning staff for a glass of water to take her medication. The staff member replied that she would ask. About 15 minutes later, Ms. Phillips was brought water enabling her to take her medications.

1    83.    At around 8:40 a.m., Ms. Phillips was told that that she would receive

2    her boarding passes soon. She had still not eaten.

3    84.    She was eventually provided her boarding pass, escorted to the gate

4    by two INM officials, and returned to LAX on a flight operated by Volaris that

5    departed at 10:18 a.m.

6    85.    Since her traumatic ordeal, Ms. Phillips has feared travel abroad to

7    Mexico, especially without a Mexican visa. Given the binational nature of her

8    work, however, she decided to seek a new Mexican business visa. After applying,

9    Mexican officials scheduled an interview of her on July 12, 2019 at the Mexican

10   consulate in Los Angeles. During the interview, Mexican consular staff informed

11   her that Mexico will deny her application for the visa as a result of the *alerta*,

12   which they said the American government placed on her passport.

13   86.    Based on the information provided to her by Mexican officials during

14   her detention in Guadalajara and when she interviewed for a Mexican visa, and

15   upon information and belief, Defendants' investigation, surveillance, and

16   collection of information about her and Defendants' placement of an *alerta* on her

17   passport frustrated Ms. Phillips' ability to travel internationally and resulted in her

18   deportation and inability to secure a Mexican business visa.

19   87.    Defendants have also caused an indefinite delay in the processing of

20   Ms. Phillips' renewal for a SENTRI pass. With her pass expiring in October, Ms.

21   Phillips reapplied for a new pass on June 3, 2019. While the renewal ordinarily is

22   approved within a matter of days, Ms. Phillips has to date not received an approval

23   on her application. Upon information and belief, the approval has been delayed

24   because of the government's investigation and surveillance of her owing to her

25   work in support of migrants.

26   88.    Ms. Phillips has never been arrested or convicted of any crime, and

27   previously passed the background check necessary for enrollment in CBP's Global

28   Entry/SENTRI program. Various government agencies have also cleared Ms.

Phillips for visiting ICE detention facilities, Bureau of Prisons facilities, California state prisons, and local jails.

89.     Ms. Phillips had no role to play in assisting migrants traveling in the 2018 caravan. She was not present during unrest at the border on November 25, 2018 or on December 31, 2018. On November 25, she was assisting clients in family separation cases in Tijuana approximately ten miles from where the tear gassing occurred, and on December 31 was in Los Angeles, California.

90.     Nothing in her background, other than Defendants' surveillance operation targeting her, explain the delays in her SENTRI approval, the denial of her Mexican business visa, and her detention and deportation by Mexican officials.

91.     Due to Defendants' secret surveillance of her, Ms. Phillips ceased traveling to Mexico, which has inhibited the work she does with Al Otro Lado and has interfered with her personal travel plans. She fears detention, arrest, and investigation at the hands of both the American and foreign governments were she to travel internationally.

**C.     *Erika Pinheiro's detention and deportation as a result of Defendants' unlawful targeting of her.***

92.     Plaintiff Erika Pinheiro has worked for Al Otro Lado as its Director of Policy & Litigation since April 2017. In this capacity, her work includes the provision of wrap-around legal services for deportees, migrants, and refugees in Tijuana, as well as working with civil society organizations throughout Mexico to build a network of support for particularly vulnerable migrants, including adolescent girls and separated refugee families. Given Al Otro Lado's profile, her work is widely known and respected among civil society organizations who cater to these populations in Mexico.

93.     Prior to Defendants' investigation of her, Ms. Pinheiro worked both in the United States and in Mexico providing legal services to migrants and refugees. Upon information and belief, Defendants began investigating and

surveilling Ms. Pinheiro in 2018 due to her work, resulting in her placement on Defendants' secret watchlist.

94.     On January 29, 2019 (20 days after the date on the secret list), Ms. Pinheiro attempted to travel from San Diego to Tijuana to renew her still-valid Mexican visa, which she needed to travel to southern Mexico to meet with her clients. She successfully renewed her Mexican visa and paid the renewal fee at the San Ysidro East Port of Entry, but Mexican immigration authorities detained her as she was leaving the port. They informed Ms. Pinheiro that an *alerta* had been placed on her passport, but did not provide any additional information.

95.     During her detention, Mexican officers refused to allow Ms. Pinheiro access to two of her attorneys, other than a brief one-minute discussion with one of them who had arrived at the port concerned about Ms. Pinheiro's well-being. They also compelled Ms. Pinheiro to answer a series of questions concerning her background, immigration status, her work, and the purposes of her travel.

96.     At the end of her detention, Mexican officers denied her entry into Mexico and physically removed her from Mexican territory. She was removed after informing Mexican officials that her infant child was still in Mexico. Her entire detention lasted between two to three hours.

97.     Between January 29 and February 25, Ms. Pinheiro was unable to return to Mexico and was separated from her family. She was also unable to return to her work, most of which was based in Tijuana.

98.     Ms. Pinheiro subsequently visited the Mexican consulates in Los Angeles and San Diego on multiple occasions in order to obtain legal status in Mexico and to avoid another deportation by Mexican authorities. On February 21, 2019, she submitted her application for Mexican temporary residence status at the San Diego consulate. When the consular officials attempted to issue her visa, they informed Ms. Pinheiro that an *alerta* placed in the system prevented them from issuing the visa and that they needed approval from their central national office.

99.     On February 25, 2019, the Mexican consulate in San Diego contacted Ms. Pinheiro and informed her that the *alerta* had been lifted, allowing them to issue her a temporary residence visa. The visa would allow her to enter Mexico and adjust her status to temporary resident. The consulate informed Ms. Pinheiro that she needed to present at the Mexican immigration office at the San Ysidro Port of Entry to obtain the documentation necessary to continue her temporary residence application.

100.    The same day, Ms. Pinheiro presented at the office as instructed, and filled out the requisite paperwork. The officials asked Ms. Pinheiro to wait pending approval of the paperwork, during which time she overheard a supervisor making a call to explain that an applicant had presented with an alert in the system.

101.    Ms. Pinheiro waited for approximately 30 minutes before the same supervisor brought her into his office. He explained that an alert had been issued on her passport, and that she needed to answer questions. He presented her with a written series of questions seeking identical information as that sought by Mexican officials who detained her on January 29. Ms. Pinheiro informed the supervisor that she had previously answered the same questions. He instructed her to complete the form again, which Ms. Pinheiro did.

102.    Ms. Pinheiro then asked the supervisor if he knew where the *alerta* had come from. He replied, "This is not from the Mexican government. This is a matter at the international level and I do not have access to that information. Not even the consulate has access to that information."

103.    He further explained that alerts of this kind were normally reserved for individuals with a pending criminal matter in another country, or for people identified as posing a risk to national security.

104.    Thereafter, several other Mexican immigration officials entered the supervisor's office and began discussing Ms. Pinheiro's case. The officials specifically pressed Ms. Pinheiro as to why a foreign government would place the

*alerta.* Ms. Pinheiro responded that she is an attorney who files lawsuits against the United States government, and that she had been removed from Mexico on the same day that the United States government implemented its Remain-in-Mexico program. When Ms. Pinheiro complained about how the *alerta* had now caused her multiple detentions, the supervisor explained to her that Mexican officials do not have the power to remove the *alerta* given its international nature.

105.    Following an approximately one-hour detention, the supervisor informed Ms. Pinheiro that Mexico's central national office would allow her to travel to Mexico notwithstanding the *alerta*. He asked her to sign a declaration that stated that she still had the *alerta*, but that Mexico was allowing her to enter on a visa. Ms. Pinheiro signed the declaration, but was refused a copy of it for her records.

106.    After being allowed back into Mexico, Ms. Pinheiro subsequently met with her Mexican lawyer who informed her that the commissioner in charge of the alert system in Mexico City stated that while Ms. Pinheiro's *alerta migratoria* had been lifted, an *alerta informativa* remained on Ms. Pinheiro's passport. The consequence of the *alerta informativa*, according to the Mexico City commissioner, was that Ms. Pinheiro may be detained and questioned each time she encountered an immigration official in Mexico. Her attorney also advised her that her travel to other countries could be similarly restricted, but that the *alerta* would not be triggered until she attempted to enter another country with her passport.

107.    Based on the statements made by Mexican immigration officials and based on the information provided by Ms. Pinheiro's Mexican lawyer, and upon information and belief, Defendants' surveillance program resulted in the creation and retention of records about Ms. Pinheiro's protected work as a lawyer and her associations with her clients and other civil society organizations. The program also led to her detentions in January and February, and the placement of alerts on

1    her passport which have frustrated her ability to travel internationally.

2        108.   As with Ms. Phillips, Ms. Pinheiro has never been arrested or

3    convicted of any crime. In fact, she had previously obtained clearance to enter

4    American immigration detention facilities and receive confidential information

5    from the United States government related to her management of Legal Orientation

6    Programs and regarding children detained in Office of Refugee Resettlement

7    custody. She had also obtained a "no escort" clearance to perform legal orientation

8    work in Los Angeles County jails.

9        109.   Ms. Pinheiro had no role to play in assisting migrants traveling in the

10   2018 caravan. She was not present during unrest at the border on November 25,

11   2018 or on December 31, 2018. Ms. Pinheiro was in New Jersey on November 25,

12   and was at home on New Year's Eve caring for her sick child.

13       110.   Due to Defendants' secret surveillance of her, Ms. Pinheiro

14   dramatically cut down her travel to and from Mexico, inhibiting the range of work

15   she performed with Al Otro Lado. While Ms. Pinheiro has crossed the land border

16   between San Diego and Tijuana, she fears traveling internationally by air due to

17   the statements made by Mexican officials concerning the *alerta* placed on her

18   passport, and due to the investigations conducted by lawyers and advocates in

19   Mexico on her behalf. As a result, she has not traveled to visit her family in

20   Portugal or planned any other air travel out of North America. She fears detention,

21   arrest, and investigation at the hands of both the American and foreign

22   governments were she to travel internationally by air.

23       **D.    *Nathaniel Dennison's detention and interrogation by Defendants.***

24       111.   Nathaniel Dennison is a filmmaker, photographer, and freelance

25   journalist. In May 2017, he founded a non-profit, non-partisan organization called

26   Through My Eyes Foundation. The organization provides young people the tools

27   and expertise to tell stories about their experiences through the medium of

28   documentary photography and filmmaking.

112.   In October 2018, when news of the migrant caravan began dominating American airwaves, Mr. Dennison developed the idea of using Through My Eyes' resources to travel to Mexico to allow migrant youth to tell their own stories. He viewed the public conversation around migration as largely omitting narratives from migrants themselves, precisely the issue that spurred him to create his foundation.

113.   To seed the project, he posted about the idea on Facebook and began raising funds. As his non-profit was relatively new, he often used his own personal networks to raise funds for the organization.

114.   Through the assistance of friends and associates, Mr. Dennison raised money to travel to Mexico on December 2, 2018. He eventually arrived in Tijuana, Mexico on December 3 at *El Barratel*, a make-shift shelter for migrants who had traveled on the caravan and arrived at the United States-Mexico border. The shelter, on the grounds of a shuttered nightclub, opened after a previous shelter at a sports complex became too unsanitary to house people.[37]

115.   When he arrived, Mr. Dennison met with Mexican government officials stationed at *El Barratel*. They provided him with a formal credential that allowed him entry and exit into the shelter. From December 3 until December 29, Mr. Dennison lived in the shelter as a credentialed volunteer, helping with all aspects of the shelter's operation, interfacing with the Mexican government, assisting migrants with basic needs, and working on his Through My Eyes Foundation project. He coordinated and inventoried donations to the shelter, including water, socks, undergarments, and kids' toys, and assisted with food donations, janitorial services, and coordinating volunteers arriving at the shelter to assist the families staying there.

116.   On December 29, the Mexican government officials who had

---

[37] Antonio Olivo, *A Makeshift Shower in a Muddy Courtyard. Donated Meals too Far Apart.*, WASH. POST (Dec. 3, 2018), https://wapo.st/2Gq0mfi.

previously credentialed Mr. Dennison abruptly informed him that they were removing his access privileges, thereby preventing him from living there as he had. Despite an outcry from migrants at the shelter and other volunteers who had come to rely upon Mr. Dennison's support, the officials insisted on the revocation. The shelter eventually closed.

117.    Mr. Dennison subsequently found a home to stay in alongside other American humanitarian volunteers whom he had befriended. He stayed in the home until he left Mexico on January 10.

118.    On New Year's Eve, Mr. Dennison and his housemates were alerted to disturbances at a border wall in Tijuana in which migrants had been injured by tear gas launched by Border Patrol agents from the United States. Mr. Dennison and a few of his fellow volunteers immediately traveled to that section of the wall, some of whom had training in emergency medical treatment. While others provided medical aid to migrants injured by the tear gas, Mr. Dennison brought camera equipment to document the scene. He played no role in organizing migrants who had come to the border that evening, or in any of the ensuing scenes that erupted once they arrived at the wall. He eventually returned to his temporary residence early morning on January 1.

119.    On January 10, 2019 (one day after the date listed on Defendants' secret watchlist), Mr. Dennison attempted to travel back to San Diego on foot via the San Ysidro Port of Entry. Upon his arrival, Customs and Border Protection agents pulled Mr. Dennison out of a line and informed him that he had been selected for "random" questioning. They told him that he needed to take a seat in another room.

120.    Mr. Dennison waited for approximately six hours in a holding area. The room had benches for detainees facing an area with other CBP officers sitting in two-way cubicles.

121.    CBP officers then escorted Mr. Dennison to another walled-off area

that featured individual desks and chairs. He sat down in one of the chairs and faced a non-uniformed HSI officer in a blue shirt and khakis. The officer then proceeded to interrogate him.

122.   During the questioning, which lasted approximately 45 minutes, the plain-clothed officer asked Mr. Dennison many invasive questions, including what he was doing in Mexico, what role he played in supporting the migrant caravans, and whether he organized the caravans themselves. At the time, Mr. Dennison felt as though he was under arrest, unable to leave the room, and unable to refuse to answer the questions asked by the agent.

123.   After Mr. Dennison informed him of the reasons why he was in Mexico and at the shelter, the officer began inquiring further. The officer asked Mr. Dennison to describe his work at the shelter and what he did there. He also asked Mr. Dennison to describe others with whom Mr. Dennison worked at the shelter, and who else Mr. Dennison was associated with while in Mexico. Feeling coerced into sharing information, Mr. Dennison told the interviewer about his work at the shelter and his work with Through My Eyes Foundation.

124.   Despite Mr. Dennison's responses, his questioner appeared at numerous times to forcefully suggest that Mr. Dennison was an organizer of the caravan. Mr. Dennison resisted this suggestion, and stated repeatedly that he traveled to Mexico on the business of his non-profit organization. Throughout the interrogation, Mr. Dennison informed his questioner that the work of his non-profit is entirely non-partisan and that his only aim was to support migrants and their ability to tell their own stories.

125.   The agent also asked Mr. Dennison with whom he was at the New Year's Eve border disturbance. Mr. Dennison had not provided the officer any information about his presence that evening, suggesting that the officer knew in advance. Mr. Dennison repeatedly informed the officer that he played no role in organizing the march that resulted in the disturbance, or working with the migrants

that evening. He informed the officer that he only documented the scenes with camera equipment he brought with him after learning about the tear gassing.

126.   The interviewer also asked Mr. Dennison numerous questions soliciting his political views on the caravan and on migration in general. He asked Mr. Dennison how he felt about migrants traveling to the United States, what his views on resolving the migrant crisis were, and other similar questions. Mr. Dennison insisted that his own personal views were irrelevant to his work in Mexico.

127.   At one point in the questioning, the interviewer switched topics and asked Mr. Dennison, "So, what did you have to do with Charlottesville?" Mr. Dennison was shocked and puzzled, and responded, "What do you mean?" His interviewer asked again about Charlottesville, referring to the infamous "Unite the Right" rally in Charlottesville, Virginia in August 2017. Mr. Dennison said that he did not have any role to play in the protest and was not present there, despite living near Charlottesville.

128.   The officer asked Mr. Dennison if he knew people or worked with people that were present at the protests in Charlottesville. Mr. Dennison responded that he did not.

129.   The officer also asked Mr. Dennison for his political views on the events in Charlottesville, which Mr. Dennison felt uncomfortable responding to and attempted to deflect.

130.   The officer then asked if Mr. Dennison was present at demonstrations in Standing Rock. Again, Mr. Dennison was incredulous, and responded that he was not. He informed the officer that he had traveled years ago to Standing Rock, but only because a former girlfriend was from the area.

131.   The questioner ended the interrogation by asking Mr. Dennison if he had anything else to share. Mr. Dennison replied that he did not.

132.   CBP officers then walked Mr. Dennison to the United States. Shortly

thereafter, Mr. Dennison discovered that the Mexican visa he obtained when he arrived in Mexico City was gone from his possessions. Mr. Dennison had only planned to leave Mexico for about five hours, but realized that the confiscation of his visa may present problems for his return to Mexico.

133.   Upon his release, Mr. Dennison turned around and asked a nearby CBP agent about his confiscated visa. A CBP agent refused to allow him to cross, and told him that he needed to speak with other CBP officials about the missing visa. After speaking with multiple agents at the Port, Mr. Dennison was unable to retrieve his missing visa and did not cross back into Mexico.

134.   In total, the officers detained Mr. Dennison for between six and seven hours. The experience was traumatic, stressful, and resulted in lasting emotional injury to Mr. Dennison.

135.   Following that incident, Mr. Dennison did not return to Mexico, and feared maltreatment and detention at the hands of Defendants. He was unable to retrieve his equipment and belongings which he left in Mexico.

136.   When news reports of the Defendants' watchlist became public, Mr. Dennison was contacted by the reporters who broke the story and was informed by them that his name appeared on the list as a "Suspected Antifa/Organizer." Because of his lengthy detention and the invasive, coercive questioning the government subjected him to on January 10, and upon learning that his name appears on a secret government watchlist, Mr. Dennison fears traveling internationally and subjecting himself again to detention and interrogation. He also fears the government's designation of him as "Antifa/Organizer" would interfere with the work of his foundation, given that he has no affiliation with any anti-fascist organization.

137.   Mr. Dennison subsequently placed his work with migrants on hold, and has been unable to raise significant additional funds for his Foundation. The fact that his name appears on the government's watchlist has dissuaded supporters

1   of Through My Eyes Foundation from funding the organization's work for fear of

2   associating with an entity targeted by the government. Mr. Dennison continues to

3   attempt to raise money for his foundation, and has taken to working various retail

4   jobs to support himself in the meantime.

5   

**CLAIMS**

6   **First Cause of Action**

7   **Violation of the First Amendment**

8   **(Against All Defendants)**

9   138.   Plaintiffs incorporate the preceding paragraphs as if fully set forth

10  herein.

11  139.   Credible reporting that relies on leaked primary source documents

12  revealed a dragnet investigation operation that resulted in the investigation of and

13  collection of information about dozens of journalists, legal workers, and

14  humanitarian volunteers who have documented the plight of, associated with,

15  provided legal counsel to, been in contact with, or otherwise charitably supported

16  migrants traveling through Mexico to seek asylum in the United States.

17  140.   Defendants' secret program to collect and maintain private

18  information protected by the First Amendment violates Plaintiffs' right to freedom

19  of speech and freedom of association guaranteed by the First Amendment to the

20  United States Constitution.

21  141.   Not only is Defendants' secret program unconstitutional, it also

22  violates CBP policy that prohibits discriminatory treatment of members the public.

23  According to CBP Directive No. 2130-021, the agency "shall treat all individuals

24  in a non-discriminatory manner" and "with full respect for individual rights

25  including equality under the law, due process, freedom of expression and religion,

26  and freedom from excessive force, unreasonable searches and seizures, and

27

28

1  unlawful intrusions into personal privacy."[38]

2    142.  As a direct and proximate cause of Defendants' actions, Plaintiffs

3  have been chilled or otherwise prevented from exercising their rights to free speech

4  and free association. Defendants' maintenance of a secret watchlist with Plaintiffs'

5  private and protected information prevents Plaintiffs from continuing their work on

6  behalf of and in support of migrants, including, among other harms, providing

7  legal assistance to individuals seeking asylum (Ms. Pinheiro and Ms. Phillips) and

8  raising funds to support young migrants' documentary filmmaking (Mr. Dennison).

9  It also resulted in detentions, deportation, and interrogation, as well as revocations

10  of visas and withholding of SENTRI travel privileges.

11    143.  Plaintiffs are entitled to the expungement of all records unlawfully

12  created and maintained pursuant to Defendants' scheme described above, as well

13  as an order enjoining Defendants from continuing its surveillance and detention

14  operations at the border based on their First Amendment-protected activity.

15                    **Second Cause of Action**

16        **Violation of the Privacy Act, 5 U.S.C. § 552a(a)-(l)**

17                    **(Against All Defendants)**

18    144.  Plaintiffs incorporate the preceding paragraphs as if fully set forth

19  herein.

20    145.  Defendants collected and maintained records describing private and

21  protected information about Plaintiffs, including how Plaintiffs exercised their

22  First Amendment rights, in violation of 5 U.S.C. § 552a(e)(7). Collection and

23  maintenance of these records is not expressly authorized by statute, not authorized

24

25    [38] U.S. CUSTOMS AND BORDER PROTECTION, DEP'T OF HOMELAND SEC., CBP

26  DIRECTIVE NO. 2130-021, Roles and Responsibilities of U.S. Customs and Border
   Protection Component Offices and Employees regarding Civil Rights and Civil

27  Liberties Matters (June 3, 2011), *available at*
   https://www.cbp.gov/sites/default/files/assets/documents/2018-Mar/cbp-directive-

28  2130-021.pdf.

by Plaintiffs, and is neither pertinent to nor within the scope of an authorized law enforcement activity.

146.   On April 3, 2019, Plaintiff Nathaniel Dennison submitted letters to the FBI, CBP, and ICE requesting that the agencies disclose all records they maintained about him in relation to Defendants' surveillance scheme described above. The letter also requests "that all such records be immediately expunged or amended by April 26, 2019 to omit all references to him, identifying characteristics, and/or his First Amendment-protected activities, pursuant to 5 U.S.C. §§ 552a(e)(1), (e)(5), (e)(7), and (d)(2)." To date, the agencies have failed to provide Mr. Dennison with all these records, or otherwise to respond to his request for expungement.

147.   On June 21, 2019, Plaintiffs Erika Pinheiro and Nora Phillips submitted letters to the FBI, CBP, and ICE requesting all records collected and maintained by the agencies as a part of their border surveillance scheme "be immediately expunged or amended by July 8, 2019 to omit all references to her, identifying characteristics, and/or her First Amendment-protected activities, pursuant to 5 U.S.C. §§ 552a(e)(1), (e)(5), (e)(7), and (d)(2)."

148.   The FBI and ICE responded to Ms. Pinheiro's request claiming that it was unable to locate any relevant records, while CBP has not responded to date. Upon information and belief, Defendant FBI and ICE maintains records concerning Ms. Pinheiro and her First Amendment-protected activities. None of Defendant agencies have amended or expunged any records of Ms. Pinheiro.

149.   To date, none of the agencies have responded to Ms. Phillips' requests or amended or expunged any records of her.

150.   On July 22, 2019, Ms. Pinheiro also submitted a grievance to DHS via its Traveler Redress Inquiry Program seeking the expungement of all records related to her First Amendment-protected speech and activities. On July 15, 2019, Plaintiff Nora Phillips submitted her grievance to DHS via its Traveler Redress

Inquiry Program seeking the expungement of all records related to her First Amendment-protected speech and activities.

151.   Based on the foregoing, Defendants have failed to disclose records as required by Section 552a(d)(1) or expunge or amend the records as required by Sections 552a(d)(2), (e)(1), (e)(5), or (e)(7).  These records are not exempt from disclosure, amendment, or expungement pursuant to Sections 552a(j)-(k) or any other applicable law.

152.   As a result of these violations of the Privacy Act, Plaintiffs are entitled to amendment and expungement of all records unlawfully created and maintained by Defendants, as well as all such damages available to them under the Act.

<b><u>PRAYER FOR RELIEF</u></b>

153.   Plaintiffs respectfully request that the Court grant the following relief:

a.   Issue an injunction ordering Defendants, their subordinates, agents, employees, and all others acting in concert with them to expunge all records unlawfully collected and maintained about Plaintiffs, and any information derived from that unlawfully obtained information, as well as to comply with their obligations under the Privacy Act, 5 U.S.C. § 552a.

b.   Issue an injunction ordering Defendants, their subordinates, agents, employees, and all others acting in concert with them to cease investigations into and surveillance of Plaintiffs based on First Amendment-protected activity without any reasonable suspicion of criminal activity.

c.   Enter a judgment declaring unlawful under the First Amendment to the United States Constitution and the Privacy Act, 5 U.S.C. § 552a Defendants' collection and maintenance of records concerning Plaintiffs' private and First Amendment-

1                 protected activities, and Defendants' ongoing investigation and

2                 surveillance of Plaintiffs based on First Amendment-protected

3                 activity.

4       d.      Award Plaintiffs compensatory damages for violation of the

5                 Privacy Act in an amount to be proven at trial.

6       e.      Award Plaintiffs reasonable attorneys' fees and costs; and

7       f.      Grant any other relief that this Court may deem proper and just.

8

9   Dated:  July 23, 2019           Respectfully Submitted,

10                             ACLU FOUNDATION OF SOUTHERN
                                 CALIFORNIA

11                             KIRKLAND & ELLIS LLP

12

13                           By:   */s/ Mohammad Tajsar*

14                              Mohammad Tajsar
                                Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28